# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4914-18T2
                A-4968-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

R.B. and I.D.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF R.B.,

     a Minor.

_____

Submitted June 15, 2020 – Decided July 1, 2020

Before Judges Fisher and Fasciale.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0208-19.

Joseph E. Krakora, Public Defender, attorney for appellant R.B. (Robyn A. Veasey, Deputy Public Defender, of counsel; Christine Olexa Saginor, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant I.D. (Robyn A. Veasey, Deputy Public Defender, of counsel; Louis W. Skinner, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Margo E.K. Hirsch, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

R.B. (the mother) and I.D. (the father) (collectively defendants) appeal from a June 26, 2019 order terminating their parental rights to R.B. (the child)—who was thirteen and one-half years old at the time of trial—and awarding guardianship to the Division of Child Protection and Permanency (the Division). Judge Radames Velazquez, Jr., presided over trial, entered judgment, and rendered a comprehensive written opinion.

Around the age of sixteen, the mother had a son (the son) with her own father (J.B.). Years later, the mother had a daughter (the child) with the father.

The Division created a safety plan that prohibited the mother from allowing contact between J.B. and her children. The Division removed the child five years before trial, when it learned that the mother exposed the child to J.B. It was also learned that the father sexually abused the child, and the son engaged in a sexual incident with her. After weighing the evidence, which included unstable housing, substance abuse, and mental health issues, the judge concluded that the Division met its burden of proof as to the mother, and also as to the father, who did not learn he was the child's father until three years after her birth.

I.

On appeal, the mother argues:

> POINT I
>
> THE [JUDGE] ERRED IN CONCLUDING THAT [THE MOTHER] HARMED [THE CHILD] OR EXPOSED HER TO A SUBSTANTIAL RISK OF HARM.
>
> POINT II
>
> THE [JUDGE] ERRED IN CONCLUDING THAT [THE MOTHER] WAS UNWILLING OR UNABLE TO ELIMINATE ANY PERCEIVED HARM TO [THE] CHILD.

A-4914-18T2

POINT III

THE [JUDGE] ERRED IN CONCLUDING THAT [THE DIVISION] MET ITS LEGAL OBLIGATION TO MAKE REASONABLE EFFORTS TO PROVIDE [THE MOTHER] WITH SERVICES AND TO STRIVE TO OVERCOME BARRIERS TO HER PARTICIPATION IN THOSE SERVICES. THE [JUDGE] ALSO FAILED TO PROPERLY CONSIDER ALTERNATIVES TO TERMINATION OF PARENTAL RIGHTS.

A. [The Division] Failed To Provide [The Mother] With Housing Assistance and Failed To Intervene When [The Mother] Was Sexually Abused By Her Own Father.

B. The [Judge] Could Not Properly Consider Alternatives To Termination Of Parental Rights Because A Bonding Evaluation Of The Foster Parent With The Child Was Never Conducted.

POINT IV

THE [JUDGE] ERRED IN CONCLUDING THAT TERMINATION OF [THE MOTHER]'S PARENTAL RIGHTS IS IN THE CHILD'S BEST INTERESTS BECAUSE TERMINATION OF PARENTAL RIGHTS IN THIS CASE WOULD DO MORE HARM THAN GOOD BECAUSE OF THE STRONG EMOTIONAL ATTACHMENT THE CHILD HAS WITH [THE] MOTHER AND BECAUSE A BONDING EVALUATION WITH THE CHILD AND HER FOSTER PARENT WAS NEVER CONDUCTED.

On appeal, the father argues:

4

I. THE [JUDGE] ERRED IN [HIS] CONCLUSION THAT TERMINATION OF PARENTAL RIGHTS IS IN THE BEST INTERESTS OF THE CHILD UNDER N.J.S.A. 30:4C-15.1(a).

A. THE [JUDGE] ERRED IN CONCLUDING THAT [THE FATHER] IS UNWILLING OR UNABLE TO ELIMINATE THE ALLEGED HARM TO [THE CHILD] WHERE HE PROVIDED A PLAN FOR HER SAFETY AND STABILITY IN THE HOME OF HER GRANDPARENTS.

B. THE [JUDGE] ERRED IN CONCLUDING THAT [THE DIVISION] EXERCISED REASONABLE EFFORTS TO PROVIDE SERVICES TO HELP [THE FATHER] CORRECT THE CIRCUMSTANCES THAT LED TO THE CHILD'S PLACEMENT OUTSIDE THE HOME AND DID NOT FULLY EXPLORE KINSHIP LEGAL GUARDIANSHIP.

C. THE [JUDGE'S] CONCLUSION THAT TERMINATION OF PARENTAL RIGHTS WILL NOT DO MORE HARM THAN GOOD IS ERRONEOUS BECAUSE EXPERTS OPINED TO THE CONTRARY AND NO COMPARATIVE BONDING EVALUATION WAS PERFORMED.

II.

We begin our discussion with the well-settled legal framework regarding the termination of parental rights. Parents have a constitutionally protected right to the care, custody, and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). But, that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J.

527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test to determine when it is in the child's best interest to terminate parental rights. To terminate parental rights, N.J.S.A. 30:4C-15.1(a) requires the Division to prove by clear and convincing evidence:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from [her] resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the [judge] has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

6

See also A.W., 103 N.J. at 604-11. The four prongs of the test are "not discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

Our review of a family judge's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "When a biological parent resists termination of his or her parental rights, the [judge's] function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm." N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006). The factual findings that support such a judgment "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). "[T]he conclusions that logically flow

from those findings of fact are, likewise, entitled to deferential consideration upon appellate review." R.L., 388 N.J. Super. at 89.

## III.

We now turn to defendants' arguments that the judge erred in finding the Division proved each of the four prongs under the best interests test by clear and convincing evidence. We disagree with their contentions, and we affirm substantially for the reasons given by the judge. We add the following.

## A.

The first prong requires the Division to prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). "Although a particularly egregious single harm can trigger the standard, the focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. "[T]he attention and concern of a caring family is 'the most precious of all resources.'" In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999) (quoting A.W., 103 N.J. at 613). "[W]ithdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." Ibid.

As to the mother, the judge found that the parental relationship had and would continue to endanger the child's health and development. He found the mother violated the safety plan, was in denial that J.B. raped her, suffered from psychological harm due to the rape, was unable to find stable housing and employment, tested positive for cocaine and marijuana, mismanaged money resulting in an eviction, and suffered from anger management issues. The judge also found the Division offered housing assistance to the mother, among other services. He concluded these problems contributed to the endangerment of the child's health and development.

The judge found that the father also harmed the child's health and development. The judge acknowledged that the father sexually abused the child, failed to comply with court orders, and failed to undergo substance abuse evaluations or treatment despite problems with marijuana and opiates. The judge concluded that these problems therefore harmed the child.

### B.

The second prong of the best interests test requires the Division to present clear and convincing evidence that "[t]he parent is . . . unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The judge must

consider whether the parent cured and overcame the initial harm that endangered the child and whether the parent is able to continue the parental relationship without recurrent harm to the child. K.H.O., 161 N.J. at 348-49. To satisfy its burden, the Division must show the child faces continued harm because the parent is unable or unwilling to remove or overcome the harm. N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012). The first and second prongs are related, and often, "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

"Parental unfitness may also be demonstrated if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). "Keeping [a] child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

As to the mother, the judge found that she was unable or unwilling to remove or overcome the harm that led to the child's removal, and the judge emphasized that the mother failed to make progress towards reunification during the five-year period between the removal and trial. Three experts—including

the mother's expert—agreed that she was unable to safely parent the child at the time of trial and in the foreseeable future. The judge offered several examples demonstrating the mother was unwilling and unable to provide the child with a safe home.

First, the judge noted the mother had not complied with the services offered to combat her issues. Second, the Division's psychology expert, Dr. Gerald Figurelli, Ph.D., had "grave concerns" regarding the mother's downplaying of the son and the child's sexual incident because the mother planned to house both children together. Third, the mother's expert testified that she was in denial over J.B.'s abuse of her, as well as the allegations that the father abused the child. The mother's expert opined that the mother suffered deep trauma from her experiences with J.B., which led to a fragmentation of her executive functioning, and that she heavily relies on schizoid fantasies to cope with the trauma—which, according to the expert, was long-standing abuse and clinically supported. Finally, the judge emphasized that during a recent visit, the mother showed "grossly poor judgment" by drinking alcohol out of a plastic bottle during a midday visit, returning the child to her resource parent after midnight on school nights, and allowing the child to dress in provocative clothing and wear makeup.

11

As to the father, the judge reached the same conclusion. The judge identified the problems associated with the father's inability or unwillingness to parent.

> [The father] has not seen [the child] in approximately three-and-a-half years. This is largely due to [the child] unambiguously expressing her desire throughout litigation that she never wanted to see [the father] again. A Family Part [judge] . . . found by a preponderance of the evidence that [the father] sexually abused [the child]. After this finding, the [judge] suspended contact between [the child] and [the father]. Thereafter, [the father] has not complied with any court orders designed to pave the path toward possible future contact with [the child], regardless of whether some form of contact could ever ultimately be in the best interests of [the child]. These years of noncompliance prove by clear and convincing evidence that [the father] is unwilling or unable to provide a safe and stable home currently and in the foreseeable future.

Additionally, it was Dr. Figurelli's uncontroverted opinion that forcing any sort of visitation between the child and the father would harm the child.

As to the father's argument that his parents—the child's paternal grandparents—should have been evaluated as placement for the child, the judge addressed this placement option.

> [The child] was vehemently against being placed or visiting with the paternal grandparents, because she feared that they would provide contact with [the father]. [The father] himself admitted that his hope was that [the child] would be placed with his parents [so] that he

12

could reinitiate contact with her outside the [c]ourt's supervision.

While not determinative, a judge should consider a mature child's wishes when deciding whether to terminate parental rights. N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 112-13 (2008). Additionally, Dr. Figurelli recommended that the child not be placed with her paternal grandparents. We therefore find that the judge's findings as to prong two were supported by adequate, substantial, and credible evidence.

C.

As to prong three, N.J.S.A. 30:4C-15.1(a)(3) requires the Division to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home," and the judge to "consider[] alternatives to termination of parental rights." The judge found the Division provided defendants—and the child—with a plethora of services.

As to the mother, the judge found the Division made available individual counseling, group counseling, grief counseling, anger management, and sexual abuse counseling; alcohol-abuse assessments, drug screens, and drug treatment; two therapeutic visitation programs, visitations, and supervised visitation; psychological, psychiatric, and bonding evaluations; bus passes and

13

transportation aides; and parent-mentor services, homemakers, and parenting skills classes. Likewise, as to the father, the Division made available substance abuse assessments and treatment, individual therapy, and a psychological evaluation. Moreover, as for the child, the Division arranged for speech therapy, supervised visitation, camp, counseling, therapy, CMO services, psychological evaluations, and mental health services.

Defendants argue the resource parent should not have been a placement option because no bonding evaluation was conducted between the resource parent and the child. A bonding evaluation is not necessary where termination "was not predicated upon bonding, but rather reflected [the child's] need for permanency and [the parent's] inability to care for [the child] in the foreseeable future." N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996); see also L.J.D., 428 N.J. Super. at 491-92. Here, a bonding evaluation was not required because termination was necessary to give the child permanency, and the judge determined that defendants could not provide this stability. After the resource parent testified, the judge found she understood the child's needs and she was "very persuasive and insightful in her understanding of all the complex dynamics at issue in this case." He also found her credible when she said she intended to adopt the child, thus creating permanency.

14 <span>A-4914-18T2</span>

As previously noted, the judge's rejection of the grandparents for possible placement is well supported by the record. As to the father's contention that the judge erred in considering hearsay testimony regarding the child's statements that she did not want to live with the paternal grandparents, the father failed to object to these statements. See R. 2:10-2 (noting that a trial error or admission may be disregarded "unless it is of such a nature as to have been clearly capable of producing an unjust result"); see also N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 341-42 (2010) (declining to find error where the defendant consented to the admission of relevant documents). Thus, the judge correctly found that no viable alternatives to termination of parental rights existed.

### D.

The fourth prong of the best interests test requires a determination that the termination of parental rights "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The judge must ask whether, "after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." K.H.O, 161 N.J. at 355. This prong "cannot require a showing that no harm will befall the child as a result of the

A-4914-18T2

severing of biological ties." Ibid. "The overriding consideration under this prong remains the child's need for permanency and stability." L.J.D., 428 N.J. Super. at 491-92. "Ultimately, a child has a right to live in a stable, nurturing environment and to have the psychological security that [her] most deeply formed attachments will not be shattered." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 453 (2012). "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

The mother argues the Division failed to satisfy prong four because there was no comparative bonding evaluation between the resource parent and the child, and that if the resource parent adopts the child, she will forbid the mother from seeing her daughter, thus harming the child. Again, a comparative bonding evaluation is not necessary here because the termination was based on the child's need for permanency and stability. See B.G.S., 291 N.J. Super. at 593.

Additionally, the judge found that termination of the mother's parental rights would not do more harm than good. Dr. Figurelli expressed that the child showed persistent "clinginess," concluding the relationship was not necessarily

16

secure. He opined that the mother had problems maintaining appropriate boundaries with the child, which the resource parent also testified to. Dr. Figurelli concluded that the bond—though strong—was more akin to a sibling relationship than a developmentally secure parental bond. The judge found Dr. Figurelli credible and therefore determined that the Division met prong four as to the mother.

As to the father, the judge found that he did not have a relationship with the child for "the first several years of her life." He had no contact with her for the first three and one-half years. At the time of trial, the child wanted "absolutely no contact" with the father. Dr. Figurelli opined that contact with the father would be detrimental to the child. The judge found that the child "ha[d] stabilized" and had "begun to treat her trauma" in the resource parent's care. Thus, he concluded that the Division had shown by clear and convincing evidence that termination of the father's parental rights would not do more harm than good.

According to Dr. Figurelli, termination of parental rights was unavoidable and necessary for the child's health, development, and safety. The resource parent wants to adopt the child and understands her developmental needs. As the judge pointed out, defendants had over five years to work toward

17

reunification, and the child suffers from "very traumatic experiences and is currently doing well in a resource home that provides her with the safety and stability that she particularly needs." Moreover, the judge found that the child is now a teenager and needs the psychological certainty that permanency provides.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4914-18T2